## SCOTT *et al. v.* CITY OF TOLEDO.

*(Circuit Court, N. D. Ohio, W. D.* September 28, 1888.)

1. EMINENT DOMAIN—CONSTITUTIONAL LAW—DUE PROCESS OF LAW—MUNICIPAL CORPORATIONS.

Appropriation of land by a city for a public street under an ordinance, though authorized by a state statute, requiring the remaining land of the ow1-ers to be assessed by the front foot for the entire costs and expenses incident to and resulting from the appropriation, together with all the expenses of laying off and opening the street, without requiring compensation to be first made to the owners for the land so taken, is in violation of the requirement of Const. U. S. 14th amend., that no state shall "deprive any person of life, liberty, or property, without due process of law."

2. SAME—MUNICIPAL CORPORATIONS—PUBLIC IMPROVEMENTS—ASSESSMENTS—NOTICE.

In levying special assessments upon property for the purpose of opening and improving a street, it is an essential element of "due process of law" that notice or an opportunity to be heard be given to the owner of the land so assessed, especially where the statutes of the state (Rev. St. Ohio, § 2283) require that, "so far as practicable, regard must be had, in making special assessments, to the probable benefits to the property assessed," and where the assessment so levied may, under the laws of the state, be collected by distress without notice to the owner.

3. SAME.

The notice required by Rev. St. Ohio, § 2304, of the adoption of the preliminary resolution declaring the necessity of opening the street and appropriating the lands, having no reference to any assessment to defray the expenses thereof, is not sufficient to make a subsequent assessment, without further notice, valid.

In Equity.

Application by Maurice A. Scott and another for an injunction to restrain the city of Toledo from enforcing an ordinance authorizing the appropriation of land of complainants for the purpose of a public street, and the assessment of the costs and expenses upon the remaining lands of complainants.

*Brown, Geddes & Jackson,* for complainants.

*Guy W. Kinney,* City Sol., and *Parks & Barber,* for defendant.

JACKSON, J. The present suit seeks to enjoin and restrain the city of Toledo, its officers, agents, and attorneys, from proceeding or attempting to enforce a certain ordinance passed on or about November 30, 1885, by the common council of said city, entitled "An ordinance to lay off, open, and extend Woodruff avenue," which provided for the appropriation by said city of certain real estate belonging to complainants, for the purpose of a public street or highway, as an extension of Woodruff avenue, and which assessed upon complainants' lots and lands bounding and abutting upon said avenue so to be laid out and extended, on the basis of a foot-frontage assessment, the entire costs and expenses incident to and resulting from said appropriation, together with all expenses of laying off, opening, extending, widening, straightening, and improving said extended avenue. Said ordinance is as follows:

"An ordinance to lay off, open, and extend Woodruff avenue:

"Section 1. Be it ordained by the common council of the city of Toledo, two-thirds of all members concurring, that Woodruff avenue shall be laid off,

v.36F.no.7—25

opened, and extended and made a uniform width of sixty-six (66) feet, from Scottwood avenue (formerly Raymond street) to the west line of the east 1 46-100 acres of that part of the west half of the north-west one-fourth of section 35, town 9, range 9 east, south of lots 1 and 2, and north of Monroe street.

"Sec. 2. That for the purpose of laying off, opening, and extending said Woodruff avenue, and making the same a uniform width of 66 feet between the aforesaid points, it is necessary and hereby ordered that the following described parcels of lots or lands be appropriated by the city of Toledo, to-wit: Being more particularly described as follows, to-wit: Commencing at a point where the south line of Woodruff avenue produced intersects the west line of Scottwood avenue; thence north 66 feet along the west line of Scottwood avenue to the north line of Woodruff avenue produced; thence along the north line of Woodruff avenue produced to the west line of the east 1 46-100 acres of that part of the west half of the north-west one-fourth of section 35, town 9, range 7 east, south of lots 1 and 2, and north of Monroe street; thence south along said west line above described to the south line of Woodruff avenue produced; thence east along said south line of Woodruff avenue produced to the place of beginning,—which lies within the lines of said Woodruff avenue extended, and not now dedicated for street purposes, and being in said city of Toledo, Ohio.

"Sec. 3. That the costs and expenses of laying off, opening, extending, and widening and straightening said street, including all expenses incident to and resulting from the appropriation of the lots and parcels of land hereinbefore described, shall be assessed upon the lots bounding and abutting upon said Woodruff avenue, between Scottwood avenue and the west line of the east 1 46-100 acres above described, in proportion to the foot front, and the amount so assessed shall be payable in two annual installments.

· "Sec. 4. The city solicitor is directed to institute the necessary proceedings in the probate court of Lucas county for the condemnation and appropriation of the lots and lands specified for the above purposes."

This extension of Woodruff avenue, which the ordinance seeks to accomplish, will affect only the property of complainants; that is, the land of no other party or parties will be appropriated thereunder, and the only lots bounding and abutting on said proposed extension, and subject to the foot-front assessment, made to cover the costs and expenses incident to and resulting from the appropriation and the improvement of the street, are the remaining lands of complainants, left after carving out the street. Thus, under the practical and actual operation of said ordinance, there will be taken from or off the land of complainant Scott 33 feet in width adjoining the center line of said proposed extension, leaving him a narrow strip of ground with a frontage on said street or extension of 150 feet in length and 17 feet in width. This 17 feet in width, at one end of the strip, has a frontage on Scottwood avenue, (a street crossing said Woodruff avenue extension at right angles.) From the land of complainant Calkins there will be appropriated, at the west end of the proposed extension, a parcel of ground 66 feet in width, leaving her on either side thereof a frontage of 75 feet; and from the east end of her property there will be taken 33 feet in width, leaving her a frontage on said extension of 150 feet. The frontage on said extended avenue of complainant Scott's remaining ground will be 150 feet, and of complainant Calkins will be 300 feet. This frontage of complainants, being the only property bounding and abutting on said proposed extension, is by the

terms of the ordinance assessed on the foot front with all the costs and expenses incident to or resulting from the appropriation of complainants' land for the purpose of the street sought to be opened and extended; and is also charged with all the expenses of laying off, opening, and extending and widening and straightening said street. Under a stipulation of the parties it is agreed that—

"The amount which said Scott can recover for his property so appropriated, and damage to his remaining property, will be not less than the sum of $1,500, and not more than the sum of $2,000. The amount which said Calkins can recover for the property so appropriated, and for damage to her remaining property, will be not less than the sum of $4,000, and not more than the sum of $5,000. The total amount which will be chargeable to the property bounding and abutting upon that part of Woodruff avenue so laid off, opened, and extended will not be less than $4,500, or ten dollars ($10.00) per foot front upon each front foot thereof. There will be chargeable to the property [remaining] of said Scott, at the rate aforesaid, the sum of not less than fifteen hundred dollars, ($1,500.00,) and to the property of said Calkins a sum not less than three thousand dollars, ($3,000.00.) The value of the remainder of said Scott's property, after said improvement shall have been made, which will be subject to said assessment, will be not more than the sum of seven hundred dollars, ($700.00,) and the value of said Calkins' property remaining after said improvement shall have been made, subject to said assessment, will be not to exceed the sum of eight thousand dollars, ($8,000.00.)"

Complainants were not given any notice of the passage of said ordinance, and of the foot-front assessment therein made on this bounding and abutting property; nor was any opportunity afforded them, either before or after its passage, to be heard before the common council in respect to said assessment, which undertook to provide for the costs and expenses connected with said appropriation in the manner above stated. In July, 1885, before the passage of said ordinance, the common council of Toledo adopted a resolution declaring it necessary to lay off, open, and extend Woodruff avenue by appropriating the necessary lands lying within the proposed street. This resolution was duly published in a daily newspaper of said city, and notice of its passage was given to complainants. Said resolution required all persons claiming damages on account of said proposed improvement to file their claims therefor with the city clerk within four weeks from the first publication of the resolution, or within 20 days after service of written notice of the same. This was the only step in the city's proceedings of which the complainants were given notice; but neither the resolution nor the notice given complainants thereof furnished any information as to how or in what manner the city council proposed or intended to secure the appropriation of the lands required to lay off, open, and extend said avenue, nor of the way in which the costs and expenses incident to or resulting therefrom were to be met, or by whom paid.

No question is made as to the power and authority of the common council of Toledo, under the constitution and laws of Ohio, to appropriate private property for the purpose of laying out and opening streets, which may be deemed necessary or convenient for the public use, upon making just compensation to the owner of the property so taken. To

effectuate such appropriation, where the parties cannot agree upon the price of the property taken, or sought to be acquired, the city must apply to certain designated courts for a condemnation of the land wanted, and to determine the owner's compensation therefor, and his damage to the remaining property, which are to be ascertained and assessed by a jury. The details of such proceedings in court are not involved in this case, and need not be specially noticed. The city of Toledo, under the ordinance in question, had the undoubted right to apply to the courts of the state for a condemnation of the property sought to be appropriated for the extension of Woodruff avenue, and to have fixed and ascertained by a report of a jury the compensation and damages that should be paid the owners therefor. But in making such application to the court there is no provision of the law allowing or authorizing the owner of the property sought to be taken to inquire into or contest the validity of such an assessment as that made by the ordinance in question. Such court proceedings would relate only to an ascertainment of the compensation and damages to be allowed the owner upon the condemnation of his property. In ascertaining the compensation and damages that should be awarded the owner for the property sought to be appropriated to such public use, the constitution of the state requires such compensation to be "first made in money, or first secured by a deposit of money;" and that it "shall be assessed by a jury, without deductions for benefits to any property of the owner." Article 1, § 19. And by article 13, § 5, of said constitution, it is further provided that "no right of way shall be appropriated to the use of any corporation until full compensation therefor be first made in money, or first secured by a deposit of money, to the owner, irrespective of any benefit from any improvement proposed by such corporation; which compensation shall be ascertained by a jury of twelve men, in a court of record, as shall be prescribed by law." Under these provisions of the organic law of the state, it seems clear that no benefits which might result to complainants or to their adjoining and abutting property from the laying out, opening, and extension of Woodruff avenue could be lawfully estimated in reducing or offsetting the compensation to which they would be entitled for the appropriation of their property to the purpose contemplated by said ordinance. For so much of their property as the city needed for the proposed extension of Woodruff avenue they were entitled, by the requirements of the constitution, to full compensation in money, "without deduction for benefits to any property" belonging to them resulting from such proposed improvement. The general assembly, in the organization of cities and incorporated towns or villages, as they were empowered to do by general laws, could not confer upon such municipalities or the courts any authority to disregard these provisions of the constitution relating to the manner in which compensation for private property taken or appropriated for public use should be ascertained and paid for. The statutes of the state relating to the right of cities and incorporated villages to appropriate private property for streets or other public purposes, or conferring upon them power and authority to levy taxes or make special assessments for local improve-

ments, should, therefore, be read and interpreted in the light of these provisions of the fundamental law. The authority under which the assessment made in and by the ordinance in question is sought to be sustained is found, as defendant's counsel insist, in sections 2263, 2264, 2267, and 2271 of the state statutes, which provide as follows:

"Sec. 2263. When the corporation appropriates or otherwise acquires lots or lands for the purpose of laying off, opening, extending, straightening, or widening a street, alley, or other public highway, or is possessed of property which it desires so to improve, the council may assess the cost and expenses of such appropriation or acquisition, and of the improvement, or of either, or of any part of either, upon the general tax-list, in which case the same shall be an assessment on all the taxable real and personal property in the corporation.

"Sec. 2264, (as amended April 20, 1881.) In the cases provided for in the the last section, the council may decline to assess the costs and expenses therein mentioned, or any part thereof, except as hereinafter mentioned, on the general tax-list, in which event such costs and expenses, or any part thereof which may not be so assessed on the general tax-list, shall be assessed by the council on the abutting and such adjacent and contiguous or other benefited lots and lands in the corporation, either in proportion to the benefits which may result from the improvement, or according to the value of the property assessed, or by the feet front of the property abutting upon the improvement, as the council, by ordinance setting forth specifically the lots and lands to be assessed, may determine before the improvement is made, and in the manner and subject to the restrictions herein contained; and the assessments shall be payable in one or more installments, and at such times as council may prescribe." 78 Ohio Laws, 259.

"Sec. 2267. No public improvement, the cost or part of the cost of which is to be specially assessed on the owners of adjacent property, and no order appointing assessors of damages or confirming their report, shall be made without the concurrence of the council, and it shall be essential that two-thirds of the whole number of the members elected to the council concur, unless two-thirds of the owners to be charged petition in writing therefor."

"Sec. 2271, (as amended May 4, 1885.) In cities of the first class, and in corporations in counties containing a city of the first grade of the first class, the tax or assessment specially levied or assessed upon any lot or land for any improvement shall not, except as provided in section twenty-two hundred and seventy-two, exceed twenty-five per centum of the value of such lot or land after the improvement is made, and the cost exceeding that per centum shall be paid by the corporation out of its general revenue; and, except as provided in section twenty-two hundred and seventy-two, there shall not be collected of such assessment in any one year more than one-tenth of such value of the property on which the assessment is made; and in cities of the third grade, first class, said tax or assessment shall not exceed twenty-five per centum of the value of such lot or land after the improvement is made; and whenever any street or avenue is opened, extended, straightened, or widened, the assessment for the cost and expense thereof shall be assessed only on the lots and lands bounding and abutting on said street or avenue so improved: provided, that nothing in this section contained shall apply to any improvement ordered, commenced, or completed prior to the passage of this act." 82 Ohio Laws, 260.

In connection with these and other sections of the statutes relating to the subject of municipal improvements, counsel for the city of Toledo cite and rely upon the case of *Cleveland* v. *Wick*, 18 Ohio St. 303, in which

the supreme court of Ohio, construing the constitution and statutes of the state, held that a municipal corporation had authority to levy an assessment upon lands fronting on a street, to reimburse the corporation for the amount of compensation paid the owner for his other land taken for the street, and for expenses incurred by the city in its improvement as a highway, and that such action was not in violation of the constitutional provision requiring full compensation in money to be paid the owner "without deduction for benefits." In that case, it will be noticed, the appropriation of and payment for the property, and the assessment to reimburse the city for its expenses and outlays thereby incurred, were separate, distinct, and disconnected acts. Some time after the property had been condemned, and the owner paid therefor "without deduction for benefits," the city of Cleveland made a front-foot assessment on all the property abutting on the street, including that of the party whose property had been previously appropriated, to reimburse the city for its expenses in laying out and completing the improvement of such street. Its action was sustained, as not being in violation of the constitutional provision requiring the payment of compensation "without deduction for benefits." But in the present case the ordinance in question does not propose to follow the course pursued by the city of Cleveland. It "does not contemplate the payment of a single penny out of the city treasury" for the property of complainants which it is proposed to appropriate for public use; on the contrary, the ordinance and assessment therein made expressly provide that "the costs and expenses incident to and resulting from the appropriation, together with all the expenses of laying off, opening, and extending and widening and straightening said street, shall be assessed upon the lots bounding and abutting upon said Woodruff avenue," between the designated points. By section 2249 of the Ohio Statutes the costs occasioned by the inquiry and ascertainment of the owner's compensation for property appropriated are required to be paid by the corporation; but under this ordinance and assessment the owners of the property proposed to be taken are required to pay such costs. By the provisions of the constitution the owners are entitled to be paid full compensation in money for the value of their property appropriated, which includes damage to their remaining property, "without deduction for benefits to any property;" but under the actual operation of the ordinance and assessment in question, the complainants are required to pay, in full for their own property appropriated to the public use of the city. The city proposes to acquire the complainants' property "without the payment of a single penny out of its treasury," and without entering into any obligation involving the expenditure of money out of the general or other funds of the city. By section 2271 (as amended May 4, 1885) it is provided that special assessments levied or assessed upon any lot or land for any improvement shall not (except as provided in section 2272) exceed 25 per centum of the value of such lot or land after the improvement is made; but by the ordinance and assessment under consideration the special assessment made on the property of complainants, as shown by the agreed statement above quoted, largely exceeds this limitation.

Again, by section 2283 it is provided that, "so far as practicable under the provisions of this title, regard must be had, in making special assessments, to the probable benefits to the property assessed." The ordinance and special assessment in this case entirely disregard that requirement of the law, which appears to have been observed in *Cleveland* v. *Wick*, *supra*. Again, by section 2286 it is provided that "the owner shall not be liable, under any circumstances, beyond his interest in the property assessed at the time of the passage of the ordinance or resolution to improve;" but in the present case the front-foot assessment on the remaining property of complainant Scott will amount to $1,500 or $2,000, while the lot on which it is assessed does not exceed in value the sum of $700. It may well be doubted whether the decision of the supreme court of Ohio in *Cleveland* v. *Wick*, 18 Ohio St. 303, will sustain such a proceeding as the scheme devised by the common council of Toledo for acquiring the property of complainants without expense to said city. This court is inclined to the opinion that the present is, in many essential particulars, distinguishable from the case of *Cleveland* v. *Wick*, and that its proper determination is not controlled by that decision, even considering the questions here involved alone under the constitution and laws of Ohio. The decision of the supreme court of Ohio in *Cleveland* v. *Wick*, in its construction of the state constitution and statutes, is, of course, conclusive on this court upon the question there presented; but whether that goes to the extent of sanctioning a procedure on the part of municipalities like the one in question, designed and intended, in advance, to make the owner of property pay for its appropriation to public use, admits of serious doubt and question.

But the questions raised and involved in the present case do not depend alone upon the proper construction of the constitution and statutes of Ohio. It is urged on behalf of complainants that, even admitting the constitution and laws of the state, as construed in *Cleveland* v. *Wick*, or otherwise, authorize such an ordinance and assessment as the one here involved, such a proceeding is in violation of that provision of the fourteenth amendment to the constitution of the United States which declares: "Nor shall any state deprive any person of life, liberty, or property without due process of law." It is claimed that the ordinance and assessment in question, if sanctioned by the statutes and constitution of Ohio, is "without due process of law." This, of course, presents a federal question, which must be settled and determined by subjecting the Ohio statutes and constitution, and the proceedings of the common council of Toledo here called in question, to the test of the requirements of the constitution of the United States as embodied in the fourteenth amendment.

Counsel for complainants, on this branch of the case, submit for consideration, upon the facts, two leading and general questions of law:

"(1) May a municipal corporation appropriate private property for the purposes of a public highway, and compel the owner thereof to repay to the corporation, by an assessment upon his remaining property, not only the entire amount which it has paid him for the property appropriated, but also the costs

and expense of ascertaining that amount, and the damages resulting to such remaining property from the taking of the property appropriated? (2) May private property be appropriated for public uses, and a charge levied to pay therefor, without affording the person whose property is to be charged a time, place, or tribunal where he may be heard, before the liability for such charge is finally established, and the amount thereof definitely fixed?"

Upon the first proposition it is insisted on behalf of complainants that compensation for private property taken for public uses is an essential element of that "due process of law" without which the citizen cannot be lawfully deprived of his property. For the defendant it is claimed that "the fourteenth amendment does not prohibit the taking of private property by a state without compensation;" in other words, that the appropriation of private property for public use, without compensation to the owner, is not depriving him of his property "without due process of law." Counsel for defendant further say that, "even if 'due process of law' be held to require compensation, the kind of compensation may still be determined by the state, and, in the absence of express constitutional provision to the contrary, the property may be compensated for in special benefits, and it is clearly within the province of the state to provide for estimating this compensation in any manner which involves 'due process of law,'—that is, notice and a hearing." We need not pause to consider this latter proposition. It is not material to the present case. It suggests a question not here involved, because it clearly appears from the pleadings, exhibits, and agreed statement of facts that no "special benefits" will inure to complainants from the appropriation of their property, but, on the contrary, that it will result in damage to their remaining property. It would be an anomaly to say that property is specially "benefited" by the same act which damages it. A further reason for not discussing this last suggestion of defendant's counsel as to the right of the state to determine the kind of compensation that shall be awarded the owner for property taken for public use, is found in the fact that the action of the common council of Toledo herein called in question, as counsel for defendant admits, is not an attempt to pay for the property to be appropriated by the benefits resulting to other property from the appropriation. If such had been the true character of the proceeding, it would clearly violate the provisions of the state constitution, and, independent of the federal questions involved, would entitle complainants to enjoin its enforcement. The single question is therefore presented, whether, in the taking of private property for public use, "due process of law" requires that compensation shall be made to the owner for the property so appropriated. In other words, may a state, or any subordinate division thereof, since the adoption of the fourteenth amendment to the constitution of the United States, take the property of its citizen for public purposes without making him compensation therefor? Does "due process of law," without which the citizen cannot, under this fourteenth amendment, be deprived of his property by the state, involve as a necessary and essential ingredient the payment or the making of compensation for private property appropriated to public use? This precise

question has not yet been passed upon, either by the supreme court of the United States or the state courts, so far as we have been able to discover, and it must therefore be considered and determined upon the general principles applicable to the subject.

No attempt will be made to define the exact scope of the terms "due process of law." No court has yet succeeded in giving to these words an exact definition applicable to all the varied cases in which they may be involved. The supreme court has said (*Davidson* v. *New Orleans*, 96 U. S. 104) that, instead of attempting to define what constituted "due process of law," it was wiser, in ascertaining the intent and application of such an important phrase in the federal constitution, to adopt the gradual process of judicial inclusion and exclusion, as the cases presented for decision shall require, and thus, by actual application, give to the words their proper meaning. In a general sense, "due process of law" is identical in meaning with the phrase, "law of the land," as used in the constitutions of the several states. Cooley, Const. Lim. 432. As applied to the appropriation of private property for public uses under the power of eminent domain, "due process of law" clearly does not mean mere legislative enactments, nor simple compliance with the forms of law, nor even constitutional provisions, if they be inconsistent with previously established legal rights. Thus, in Cooley, Const. Lim. 433, it is said:

"That construction would render the restriction absolutely nugatory, and turn this part of the constitution into mere nonsense."

And, again, (at p. 435:)

"The principles, then, upon which the process is based, are to determine whether it is due process or not, and not any considerations of mere form. * * * When the government, through its established agencies, interferes with the title to one's property, or with his independent enjoyment of it, and its action is called in question as not in accordance with the law of the land, we are to test its validity by those principles of civil liberty and constitutional protection which have become established in our system of laws, and not generally by rules that pertain to forms of procedure merely. * * * 'Due process of law,' in each particular case, means such an exertion of the powers of government as the settled maxims of law permit and sanction, and under such safeguards for the protection of individual rights as those maxims prescribe for the class of cases to which the one in question belongs."

To the same effect is the language of the supreme court in *Davidson* v. *New Orleans*, 96 U. S. 102, where the court, speaking by Mr. Justice MILLER, after explaining the reasons why the phrase "law of the land," as used in *magna charta*, was not directed against the enactments of parliament, proceeds to say:

"But when, in the year of grace 1866, there is placed in the constitution of the United States a declaration that 'no state shall deprive any person of life, liberty, or property without due process of law,' can a state make anything due process of law which, by its own legislation, it chooses to declare such? To affirm this is to hold that the prohibition to the states is of no avail, or has no application where the invasion of private rights is effected under the forms of state legislation. It seems to us that a statute which declares in terms, and without more, that the full and exclusive title of a described piece of land,

which is now in A., shall be and is hereby vested in B., would, if effectual, deprive A. of his property without due process of law within the meaning of the constitutional provision."

In this case of *Davidson* v. *New Orleans*, 96 U. S. 107, Mr. Justice BRADLEY said:

"If a state, by its laws, should authorize private property to be taken for public use, without compensation, * * * I think it would be depriving a man of his property without due process of law. * * * I think, therefore, we are entitled under the fourteenth amendment, not only to see that there is some process of law, but 'due process of law,' provided by the state law, when a citizen is deprived of his property; and that, in judging what is 'due process of law,' respect must be had to the cause and object of the taking, whether under the taxing power, the power of eminent domain, or the power of assessment for local improvements, or none of these; and, if found to be suitable or admissible in the special case, it will be adjudged to be 'due process of law;' but if found to be arbitrary, oppressive, and unjust, it may be declared to be not 'due process of law.' "

In the *Kentucky Railroad Tax Cases*, 115 U. S. 331, 6 Sup. Ct. Rep. 57, this language of Mr. Justice BRADLEY is quoted with approval by the supreme court. , It is a fundamental principle of the common law, established and well settled before the adoption of the federal constitution, that the proper and lawful exercise of the sovereign right of eminent domain involves these two essential elements, viz., that the property must be taken for the public benefit, or for public purposes, and that the owner must be compensated therefor. The exercise of the power of eminent domain is, in legal effect, nothing more than an enforced sale, for the public benefit, at a fair price, to be ascertained in some proper mode, and to be paid the owner for the property so appropriated. This long and firmly established principle hardly requires any discussion or citation of authority in its support. It is thus clearly and forcibly expressed by one of the earliest and ablest law writers:

"So great, moreover, is the regard of the law for private property, that it will not authorize the least violation of it; no, not even for the general good of the whole community. If a new road, for instance, were to be made through the grounds of a private person, it might perhaps be extensively beneficial to the public; but the law permits no man or set of men to do this without consent of the owner of the land. * * * In this and similar cases the legislature alone can, and, indeed, frequently does, interpose, and compel the individual to acquiesce. But how does it interpose and compel? Not by absolutely stripping the subject of his property in an arbitrary manner; but by giving him a full indemnification and equivalent for the injury thereby sustained. The public is now considered as an individual, treating with an individual for an exchange. All that the legislature does is to oblige the owner to alienate his possessions for a reasonable price, and even this is an exertion of power which the legislature indulges with caution, and which nothing but the legislature can perform." Cooley, Bl. bk. 1, p. 137.

In the same work, (book 2, p. 35, note,) on the subject of "Ways," it is said:

"A public way is established either by the dedication of the owner of the land or by an appropriation of the land for the purpose by the sovereign authority, under what is called the 'right of eminent domain.' When this right

is exercised, it must be in pursuance of some express legislative authority which prescribes the formalities, and compensation must be made to the owner."

So, too, in Mills, Em. Dom. § 1, it is said on this subject:

"The annals of all nations enjoying a constitutional government, and of many despotic nations, show that the moral sense of mankind requires such compensation. In the absence of provisions in the constitution, the courts have considered that the principle was so universal and fundamental that laws not recognizing the right of the subject to compensation would be void."

These well-recognized principles, vital to the security, and essential to the protection, of the citizen against the arbitrary exercise of power on the part of the government, were in full force at the adoption of the constitution of the United States. They were not, however, fully recognized in that instrument as originally adopted. The fifth amendment, providing that private property should not be taken for public use without just compensation, was accordingly required for the better security of private property against the power of government. This amendment to the constitution, which recognized and secured to the citizen, as a fundamental principle, the right to compensation for private property taken for public use, was intended as a limitation upon the federal power. The first 10 amendments to the constitution recognized and secured to all citizens certain rights, privileges, and immunities essential to their security. The fifth amendment, operating only as a limitation upon the powers of the general government, fell short of giving to the citizen the full protection to which he was entitled in respect to his life, liberty, and property, so far as state action was concerned. It imposed no prohibition or limitation upon the power and authority of the states in dealing with the life, liberty, and property of the citizen. They were left to the restraints of their several constitutions and respective laws on these subjects. So far as the states were concerned, citizens of the United States were thus left without adequate protection and security in their persons and property. The fourteenth amendment was adopted to remedy and correct this defect in the supreme organic law of the land. It involves no forced or unreasonable construction to hold that this fourteenth amendment, as applied to the appropriation of private property for public uses, was clearly intended to place the same limitation upon the power of the states which the fifth amendment had placed upon the authority of the federal government. And as Judge Cooley well remarks:

"Of these amendments it may be safely affirmed that the first ten took from the Union no power it ought ever to have exercised, and that the last three required of the states the surrender of no power which any free government should ever employ."

Whatever may have been the power of the states on this subject prior to the adoption of the fourteenth amendment to the constitution, it seems clear that, since that amendment went into effect, such limitations and restraints have been placed upon their power in dealing with individual rights that the states cannot now lawfully appropriate private property for the public benefit or to public uses without compensation to the

owner; and that any attempt so to do, whether done in pursuance of a constitutional provision or legislative enactment, whether done by the legislature itself or under delegated authority by one of the subordinate agencies of the state, and whether done directly, by taking the property of one person and vesting it in another or the public, or indirectly through the forms of law, by appropriating the property and requiring the owner thereof to compensate himself, or to refund to another the compensation to which he is entitled, would be wanting in that "due process of law" required by said amendment. The conclusion of the court on this question is that since the adoption of the fourteenth amendment compensation for private property taken for public uses constitutes an essential element in "due process of law," and that without such compensation the appropriation of private property to public uses, no matter under what form of procedure it is taken, would violate the provisions of the federal constitution. There is no difference in principle between the case put by Mr. Justice MILLER, as an illustration, in *Davidson* v. *New Orleans*, 96 U. S. 102, viz., the taking property from A. and vesting it in B., and the taking of property from an individual and vesting it in the public. "Due process of law" is equally wanting in both cases; in the latter case, because such a taking, without making compensation to the owner, is nothing short of legalized robbery, or confiscation for the benefit of the public. If, therefore, the statutes of Ohio, whether in harmony with the state constitution or not, authorize the city of Toledo to appropriate the property of complainants for the purpose of a public highway, and to do this in a way which will not only exempt it from the duty and obligation of compensating them for the property taken, but impose upon complainants themselves, under the form of an assessment by the foot front, the burden of compensating themselves or of returning to the city all they may be entitled to receive as compensation for their property, such statutes are wanting in that "due process of law" required by the federal constitution; and the attempted proceedings had thereunder by the common council of Toledo are void, so far, at least, as said assessment is concerned.

The second proposition of law submitted on behalf of complainants: "May private property be appropriated for public uses, and a charge levied to pay therefor, without affording the person whose property is to be charged a time, place, or tribunal where he may be heard before the liability for such charge is finally established, and the amount thereof definitely fixed?" presents the questions whether complainants were entitled to notice or an opportunity to be heard before the assessment in question was made, and whether the statutes of Ohio provide for such notice or opportunity. It is claimed for complainants that "due process of law," in taxation or an assessment like that under consideration, includes notice and an opportunity to be heard before the charge is finally established, and the amount thereof definitely fixed, and that the statutes of Ohio relating to the subject of special assessments, or assessments on the foot-front basis, provide for no such notice and afford no such opportunity. Counsel for defendant controvert these positions, insisting that

complainants were not entitled to any notice of, or opportunity to be heard in respect to, said assessment; but that, if they were, the statutes do provide for such notice, and do afford such an opportunity to be heard, as will satisfy the requirement of "due process of law." It admits of no doubt that the assessment in question was an exercise of the taxing power of the state. Speaking of such special charges or levies, Judge Cooley, in his work on Taxation, p. 430, says: "That these assessments are an exercise of the taxing power, has over and over again been affirmed, until the controversy may ,be regarded as closed." Nor is it any longer an open question that the provision of the federal constitution prohibiting the states from depriving any person of his property "without due process of law" applies to taxation by the state or its subordinate agencies, and that, in respect to all such taxation based on values and apportionment, and involving judicial or *quasi* judicial ascertainment and determination as to the amount to be imposed upon the citizen or made a charge upon his property, "due process of law" demands and requires that, at some stage in the proceeding before the tax charge or assessment is fixed and made final and collected, he shall have notice, or an opportunity to be heard in reference thereto. This subject has been so ably and exhaustively discussed and considered in numerous recent decisions of the federal and state courts that little or nothing remains to be added; nor is it deemed necessary to extend this opinion by quoting at length from those authorities which establish the general proposition that it is essential to the validity of state taxation, other than that of a personal character, such as licenses for privileges, or the exercise of franchises, that the tax-payer shall, at some stage in the proceeding, have notice or an opportunity to be heard; that if such notice is not given, or opportunity afforded to be heard, either in levying or collecting the tax, the proceeding will be wanting in that "due process of law" necessary to give it validity under the federal constitution. The legislature may prescribe the kind of notice and the mode in which it shall be given, "but it cannot dispense with all notice." The owner must in some form, in some tribunal, or before some official authorized to correct errors or mistakes, have an opportunity afforded him to be heard in respect to the proceeding under which his property is to be taken or burdened, before the tax or assessment becomes final and effectual, in order to constitute such procedure "due process of law." If the tax or assessment can, under the state law, be enforced or collected only by legal proceedings, in which any and all defenses, going either to the validity or amount of such tax or assessment, may be made, that will afford the opportunity to be heard, and in such cases the proceeding cannot be said to deprive the owner of his property "without due process of law," however objectionable or unjust it may be otherwise. In the application of these principles there is no distinction between taxation upon values for general purposes and special assessments based upon benefits. The authorities supporting these propositions are the following: *Kennard* v. *Louisiana,* 92 U. S. 482; *McMillen* v. *Anderson,* 95 U. S. 40–42; *Davidson* v. *New Orleans,* 96 U. S. 104, 105; *Hagar* v. *Reclamation Dist.,* 111 U. S. 707–711, 4 Sup. Ct.

Rep. 663; *Kentucky Railroad Tax Cases,* 115 U. S. 335, 336, 6 Sup. Ct. Rep. 57; *Williams* v. *County of Albany,* 122 U. S. 164, 165, 7 Sup. Ct. Rep. 1244; *Spencer* v. *Merchant,* 125 U. S. 354, 355, 358, 361, 8 Sup. Ct. Rep. 921; *Stuart* v. *Palmer,* 74 N. Y. 183; *Railroad Tax Cases,* 13 Fed. Rep. 751–753, 762–766; *County of Santa Clara* v. *Railroad Co.,* 18 Fed. Rep. 410–412, 416–424; Cooley, Tax'n, 266; Welty, Assessm. §§ 250–253, and cases cited. In the cases of *Hagar* v. *Reclamation Dist.,* 111 U. S. 701, 4 Sup. Ct. Rep. 663, and *County of Santa Clara* v. *Railroad Co.,* 18 Fed. Rep. 409, the distinction between a tax or assessment which calls for no inquiry, nor for anything in the nature of judicial examination before levy and collection, and a tax or assessment imposed upon property according to its value or special benefits resulting thereto, to be ascertained by assessors or other officials upon inquiry or evidence, is pointed out and considered with reference to the necessity for notice or opportunity for hearing. In the former class of cases it is suggested that, as notice would be of no service to the individual, and no hearing could change the result, as in taxes for licenses and the exercise of franchises, such notice or an opportunity to be heard may be dispensed with; but that in the latter class of taxes and assessments, based upon values or benefits which involve inquiry, notice or an opportunity for hearing is essential, to render the proceeding valid. Counsel for defendant claim the benefit of this distinction in the present case, and insist that, as notice would have been of no service to complainants, and no hearing could have changed the result, they were therefore not entitled to such notice or hearing. But this position ignores the fact that the assessment in question falls within the latter class of cases, in which inquiry as to benefits is involved; section 2283 directing in express terms that, "so far as practicable under the provisions of this title, regard must be had, in making special assessments, to the probable benefits to the property assessed." This requirement of the statute, that regard should be had "to the probable benefits to the property assessed" in making these special assessments, necessarily involved inquiry or consideration of benefits, which rested upon facts or evidence, and called for the exercise of a *quasi* judicial determination, like taxation based upon values to be ascertained by assessors.

It admits, therefore, of little or no question, that the assessment under consideration was of that character which entitled complainants to notice, or an opportunity to be heard in respect thereto, in order to give it validity, or make the proceeding conform to due process of law. Do the statutes of Ohio provide for such notice, or afford the owners of the property assessed an opportunity for a hearing? After a careful examination of the statutes relating to special foot-front assessments, we are unable to find any such provision in the state law. It is claimed that sections 2277–2281 and 2304 provide for the requisite notice, and afford the opportunity required by "due process of law." The notice provided for in section 2304 relates merely to the passage of the preliminary resolution declaring the necessity for a certain improvement. It has no reference to any assessment that may be subsequently made in connection

with such improvement, or to defray the costs and expenses thereof. The other sections relied on are as follows:

"Sec. 2277. In cases wherein it is determined to assess the whole or any part of the cost of an improvement upon the lots or lands bounding or abutting upon the same, or upon other lots or lands benefited thereby, as provided in section twenty-two hundred and sixty-four, the council may require the board of improvements, or board of public works, (city commissioners,) as the case may be, or may appoint three disinterested freeholders of the corporation or vicinity, to report to the council an estimated assessment of such cost on the lots or lands to be charged therewith, in proportion, as nearly as may be, to the benefits which may result from the improvement to the several lots or parcels of land so assessed, a copy of which assessment shall be filed in the office of the clerk of the corporation for public inspection.

"Sec. 2278. Before adopting the assessment so made, the council shall publish notice, for three weeks consecutively, in some newspaper of general circulation in the corporation, that such assessment has been made, and that the same is on file in the office of the clerk for the inspection and examination of persons interested therein.

"Sec. 2279. If any person objects to the assessment, he shall file his objections, in writing, with the clerk, within two weeks after the expiration of the notice; and thereupon the council shall appoint three disinterested freeholders of the corporation to act as an equalizing board.

"Sec. 2280. On a day appointed by the council for that purpose, the board, after taking an oath before a proper officer, honestly and impartially to discharge their duties, shall hear and determine all objections to the assessment, and equalize the same, as they may think proper; which equalized assessment they shall report to the council, which shall have power to confirm the same, or set it aside, and cause a new assessment to be made, and appoint a new equalizing board possessing the same qualifications, which shall proceed in the manner above provided.

"Sec. 2281. When the assessment is confirmed by the council, it shall be complete and final."

It is by no means clear that section 2277 refers to front-foot assessments; but, assuming that it does, that section does not require the common council to refer the matter to the board of improvements, or other commissioners, to ascertain and report the benefits which may result from the improvement to the several lots or parcels of land to be assessed. It merely permits the common council to resort to that method of ascertaining benefits, and, when that method is resorted to, the assessment reported by the board of improvements or other committee of appraisers is not to be finally adopted by the common council until after notice (sections 2278, 2279) by publication is given, and an opportunity for inspection and examination is afforded to parties interested. If the common council, in the present case, had proceeded under section 2277, then the notice and opportunity to be heard, as provided under sections 2278, 2279, and 2280 would have been in conformity to "due process of law." But the common council, under section 2264, had the authority, and exercised it, of making the assessment for itself, without resorting to the method of ascertaining benefits, permitted by section 2277, and without being required to give notice, or afford complainants any opportunity for a hearing. These sections, relied on

by defendant, not constituting the sole method of procedure, and not in fact adopted or acted upon by the common council in making the assessment in question, cannot avail the defense. The validity of that assessment must be determined by the provisions of the statutes under which the city council acted in making it, viz., section 2264, which authorized action by the common council itself, without reference to any special board of appraisers, and as to which action by the council the statutes provide for no notice to, or opportunity to be heard by, the parties interested in or affected by the assessment. An assessment so made is wanting in "due process of law" if its collection can be enforced otherwise than by suit or legal proceedings in which all defenses to its validity or amount could be raised.

This brings us to the remaining question in the case, viz., in what way, or by what methods, may an assessment like the present be enforced under the statutes of Ohio? Three ways are provided for its collection: *First*, the amount assessed, with interest, and a penalty of 5 per cent., may be recovered by suit against the owners of the property assessed, before a justice of the peace or other court of competent jurisdiction, (section 2288,) which, of course, requires notice to the party sued; *secondly*, by proceedings, in certain designated courts, to enforce the lien when the owner of the land assessed is a non-resident, which requires notice by publication, (section 2288;) or, *thirdly*, the common council may certify any unpaid assessment to the auditor of the county in which the corporation is situated, and the amount so certified is to be placed upon the tax-list, with 10 per cent. penalty, and to be collected with and in the same manner as state and county taxes, (section 2295,) which are collected either by suit, by forfeiture and sale of the land, or by distraint of sufficient goods and chattels belonging to the person charged with such taxes or assessments. In the first two methods of collection to which the common council could or might resort, the notice provided for or required would constitute "due process of law" under the authorities above cited; but if, instead of resorting to these methods of collection, the corporation selected, as it might, the third remedy for the enforcement of the assessment, then the owners would be deprived of any opportunity to be heard in regard to the assessment, either as to its validity or amount, and this would violate the requirements of "due process of law." In this respect the present case is distinguishable from that of *Hagar* v. *Reclamation Dist.*, 111 U. S. 711, 4 Sup. Ct Rep. 663, and other like cases, relied upon by counsel for defendant, in which the assessment complained of was enforceable only by legal proceedings in which any defense going either to the validity or amount could be pleaded. The common council of Toledo having made the assessment in question without notice to, or an opportunity for hearing by, complainants, and having the right to enforce its collection by distraining and selling their property, without resorting to any suit which would give them an opportunity to interpose any defense either to the validity or amount of said assessment, its action in the premises, even if authorized by the statutes of Ohio, is wanting in that "due process of law" required

by the federal constitution before depriving the citizen of his property.

In its material facts and the principles involved, the present cannot be distinguished from the well-considered case of *Stuart* v. *Palmer*, 74 N. Y. 183, which received the express approval of Mr. Justice FIELD in the *Railroad Tax Cases*, 13 Fed. Rep. 753, and was recognized by the supreme court as a correct exposition and application of the constitutional provision relating to the taking of private property under the form of assessment "without due process of law," in the case of *Spencer* v. *Merchant*, 125 U. S. 351–358, 8 Sup. Ct. Rep. 921. The opinion of Mr. Justice EARL in *Stuart* v. *Palmer* might well be quoted in full, because of its force, clearness, and direct application to the case now under consideration, but, without extending this opinion in making such a quotation, that opinion is specially referred to as sustaining the views above expressed and the conclusions herein reached. If anything, the case under consideration presents a clearer violation of the constitutional prohibition against depriving the citizen of his property without due process of law than appeared in *Stuart* v. *Palmer*. It is difficult to conceive of anything more arbitrary and wanting in the forms of law, or more in conflict with the first principles of justice, or more in disregard of that equality of burden which should be observed in the imposition of taxes and assessments, than the action of the common council in making the assessment herein complained of, the direct operation and practical effect of which is to charge complainants with all the city's outlay and expense in the appropriation and improvement of their property for public use, and with the damage thence resulting to their remaining property. The owners are required to pay the city for so much of their own property as is devoted to public use, and for such damage as their remaining property may thereby sustain, by making a front-foot assessment on the damaged property left in their hands. This arbitrary action being taken without notice or an opportunity for hearing, is wanting in due process of law, and renders the assessment void. The Ohio cases cited by defendant's counsel, sustaining frontage assessments in certain cases based on benefits, did not consider, if they involved, the federal question as to what would constitute "due process of law" in the making of such assessments. Neither was that question discussed in the case of *Cleveland* v. *Wick*, 18 Ohio St. 303, cited above. These authorities are not, therefore, controlling in the present case. They are conclusive upon this court in the construction of the state constitution and statutes, but in respect to the federal question here presented they are not controlling.

Other questions, not of a federal character, are presented by complainants, going to the validity of the ordinance and assessment under consideration for want of compliance with certain requirements of the state statutes applicable to the case, but in the view which the court has taken of the federal questions involved it is not deemed necessary to go into these purely local matters. The conclusion of the court is that the common council of the city of Toledo may proceed, in the manner prescribed by law, with the enforcement of so much and such part of said ordinance of November 30, 1885, as relates to or seeks to appropriate complain-

ants' property to the purpose of a public street, or for the extension of Woodruff avenue, upon making or providing just compensation in money for the property so to be appropriated, and damage to their remaining property; but that said common council, and the city of Toledo, its agents, officers, and attorneys, should be restrained and enjoined from enforcing or attempting to enforce so much and such portion of said ordinance as relates to the assessment therein, and thereby made on the remaining property of complainants. Such an injunction is accordingly awarded and decreed in favor of complainants. The costs of the case will be taxed against the city of Toledo, for which execution as at law may issue.